# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **JOYCE E. WILLIAMS, etc.,**[1] ) | |
|    Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 1:13cv00071 |
| ) | |
| **CAROLYN W. COLVIN,** ) | **MEMORANDUM OPINION** |
|  Acting Commissioner of ) | |
|  Social Security, ) | |
|    Defendant ) | By: Pamela Meade Sargent |
| ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Joyce E. Williams, ("Williams"), Executor of the estate of Billy Joe Rhea, ("Rhea"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that Rhea was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] The claimant, Billy Joe Rhea, passed away on June 7, 2014, and Joyce E. Williams qualified as Executor of his estate on June 13, 2014. (Docket Item No. 13, Exhibit 1.) By order entered June 30, 2014, Williams was substituted as the plaintiff in this matter. (Docket Item No. 14.)

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Rhea protectively filed a DIB claim on May 2, 2011, alleging disability as of January 1, 2001, due to a herniated lumbar disc, chronic pain syndrome, fibromyalgia, patella-femoral pain syndrome and musculoskeletal pain syndrome. (Record, ("R."), at 119-20, 129, 141.) The claim was denied initially and on reconsideration. (R. at 59-61, 64-67.) Rhea then requested a hearing before an administrative law judge, ("ALJ"), (R. at 72.) The hearing was held on March 5, 2013, by video conferencing, at which Rhea was represented by counsel. (R. at 27-47.)

By decision dated March 21, 2013, the ALJ denied Rhea's claim. (R. at 15-23.) The ALJ found that Rhea met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2001.[2] (R. at 17.) The ALJ also found that Rhea had not engaged in substantial gainful activity during the period of January 1, 2001, his alleged onset date, and March 31, 2001, his date last insured. (R. at 17.) The ALJ found that the medical evidence established that Rhea suffered from a severe impairment, namely pain syndrome, but she found that Rhea did not

---

[2] Therefore, Williams must show that Rhea became disabled between January 1, 2001, the alleged onset date, and March 31, 2001, the date last insured, in order for Rhea to be entitled to DIB benefits.

have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ found that Rhea had the residual functional capacity to perform the full range of medium work.[3] (R. at 18-21.) The ALJ found that Rhea could perform his past relevant work as a teacher and a coach. (R. at 21.) In addition, based on Rhea's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Rhea could perform, including jobs as a tutor, a sales clerk and an order picker. (R. at 22.) Thus, the ALJ found that Rhea was not under a disability as defined under the Act from January 1, 2001, through March 31, 2001, the date last insured, and was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(f), (g) (2014).

After the ALJ issued her decision, Rhea pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 1-6.) Rhea then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2014). The case is before this court on Rhea's motion for summary judgment filed February 21, 2014, and the Commissioner's motion for summary judgment filed March 25, 2014.

## II. Facts

Rhea was born in 1957, (R. at 119), which classified him as a "person of

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2014).

advanced age" under 20 C.F.R. § 404.1563(e). He had a high school education and four or more years of college education. (R. at 142.) He had past relevant work experience as a media producer, a teacher and a coach. (R. at 142, 149.)

Andrew Beal, a vocational expert, was present and testified at Rhea's hearing. (R. at 42-46.) Beal testified that a hypothetical individual of Rhea's age, education and work history, who would be limited to performing work at the medium exertional level, would be able to perform Rhea's past relevant work as a teacher and a coach. (R. at 42-43.) Beal further testified that such an individual could perform other jobs existing in significant numbers in the national economy, including jobs as a tutor, a sales clerk and an order enterer. (R. at 43.) Beal next testified that the same hypothetical individual, but who would be limited to simple, routine, repetitive work, could not perform the jobs as a coach or a teacher. (R. at 44.) He stated that there was a significant number of jobs that the individual could perform, including jobs as a supply worker and a packer. (R. at 44-45.) When asked to consider the same individual, but who would be required to rest three-quarters of the day and who would miss, on average, two days of work a month, Beal stated that there would be no jobs available that such an individual could perform. (R. at 45.)

In rendering his decision, the ALJ reviewed medical records from Lebanon Physical Therapy; Dr. John A. Green, M.D.; Wellmont Bristol Regional Medical Center; and Teresa E. Jarrell, M.A., a licensed psychologist. Rhea's attorney submitted additional medical records from the Mayo Clinic to the Appeals Council.[4]

---

[4] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into

Rhea was treated by Dr. John A. Green, M.D., since 1984. (R. at 437.) On December 16, 1997, Rhea complained of aching in his legs and a flared prostate. (R. at 188.) On March 2, 1998, Rhea reported that he was doing "okay," but complained of anxiety. (R. at 187.) On September 1, 1998, Rhea reported worsening panic and anxiety along with continued stomach problems and leg pain. (R. at 191.) On February 13, 1999, myalgias "all over" and leg pain were noted. (R. at 190.) Rhea had mild right lower quadrant tenderness without guarding. (R. at 195.) He reported that his panic symptoms had improved with medication. (R. at 190.) On April 20, 1999, a bone scan showed increased activity over both patellae and over the tibial tuberosities, most likely degenerative in etiology. (R. at 196.) On May 12, 1999, an x-ray of Rhea's right knee was normal. (R. at 197.) On July 15, 1999, Rhea was diagnosed with temporomandibular joint pain, ("TMJ"), and tendonitis in the knee. (R. at 198.) He continued to report knee pain on August 6, 1999, October 13, 1999, and January 29, 2000. (R. at 179, 201, 203.)

On February 17, 2000, Rhea began physical therapy for treatment of his knee, spine, hip and ankle. (R. at 173.) On March 9, 2000, after attending three sessions, the therapist indicated that Rhea had experienced a flare-up in his back and that he was to discontinue physical therapy at that time (R. at 172.) The therapist stated that Rhea probably had experienced a muscular strain due to starting an exercise program. (R. at 172.)

On March 1, 2000, Rhea complained of back pain. (R. at 177.) Straight leg raising tests were negative, and his back was nontender. (R. at 177.) On August 24, 2000, Rhea reported that while his knee and back pain had improved, it was still

---

account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

bothersome. (R. at 176.) On March 29, 2001, Rhea complained of pain in his legs, knees, thighs, wrists and arms. (R. at 178.) He was diagnosed with arthritis, questionable arthralgias and insomnia. (R. at 178.) On August 10, 2001, Rhea reported that his pain had improved. (R. at 209.) He stated that he could walk three miles without difficulty. (R. at 209.) On January 29, 2002, Rhea complained of panic, anxiety, claustrophobia, knee pain and trouble sleeping. (R. at 211.) Despite these complaints, he reported that he enjoyed traveling, shopping and reading. (R. at 211.) On April 2, 2002, Rhea complained of knee, leg and right jaw pain and panic attacks. (R. at 213.) On August 21, 2002, Rhea reported persistent joint pain and worsened anxiety since his father recently passed away. (R. at 229.) On November 29, 2002, Dr. Green diagnosed abdominal pain with altered bowel movements, chronic musculoskeletal pain and chronic anxiety. (R. at 227.) Dr. Green strongly recommended counseling, but Rhea refused. (R. at 227.)

On March 1, 2004, Rhea complained of left hip pain. (R. at 242.) Dr. Green diagnosed probable lumbar strain and depression, exacerbated by the loss of his father. (R. at 242.) On March 31, 2004, Rhea reported that he was doing better. (R. at 226.) He reported that he back had gotten gradually better, and his depression had improved. (R. at 226.) On June 30, 2004, Rhea reported a lot of stress due to his mother being diagnosed with cancer. (R. at 225.) He complained of intermittent low back pain. (R. at 225.) Rhea stated that Soma had helped with his pain. (R. at 225.) On September 23, 2004, Rhea complained of back and left leg pain. (R. at 222.) He reported that medication was helping. (R. at 222.) On October 25, 2004, Rhea reported that he injured his back while attempting to lift his mother after she fell. (R. at 241.) Dr. Green diagnosed situational depression and anxiety worsened by his mother's deterioration and chronic low back pain. (R. at 241.) On November 24, 2004, Rhea complained of left hip and back pain. (R. at 240.) Dr. Green

reported that Rhea's spine and sacroiliac joint were nontender, deep tendon reflexes were intact, and Rhea was able to flex his hip and do internal and external rotation with full range of motion. (R. at 240.)

On January 6, 2005, Rhea complained of low back pain. (R. at 239.) Dr. Green noted that Rhea's back was nontender. (R. at 239.) On February 9, 2005, Rhea reported that his low back pain had resolved. (R. at 238.) On March 17, 2005, Rhea reported that his back and leg pain had gradually and progressively improved. (R. at 237.) Dr. Green noted that Rhea was excited about taking on a political campaign. (R. at 237.) Straight leg raising tests were normal, and deep tendon reflexes were intact. (R. at 237.) Dr. Green noted that Rhea's situational depression had improved. (R. at 237.) On June 22, 2005, August 22, 2005, November 7, 2005, November 21, 2005, and December 21, 2005, Rhea continued regular treatment with Dr. Green for abdominal pain, prostatitis, back pain, depression and anxiety. (R. at 230, 232-36.)

On April 5, 2006, Rhea reported abdominal pain, continuous back pain that radiated into his legs, anxiety and depression. (R. at 253.) On July 6, 2006, Rhea complained of abdominal pain. (R. at 252.) He denied depression. (R. at 252.) On July 13, 2006, a CT scan of Rhea's abdomen and pelvis showed gallstones, but was otherwise unremarkable. (R. at 250-51.) Persistent abdominal pain was reported on September 18, 2006, October 25, 2006, and December 20, 2006. (R. at 245, 247-48.) On November 29, 2006, Rhea complained of low back pain. (R. at 246.)

On February 15, 2007, Rhea complained of bilateral thigh pain. (R. at 255.) Rhea's extremities showed no clubbing, cyanosis or edema. (R. at 255.) Straight leg raising tests were negative, and Rhea had good motion in his hip. (R. at 255.)

-7-

Case 1:13-cv-00071-PMS   Document 19   Filed 02/10/15   Page 7 of 19   Pageid#: 528

On June 12, 2007, Rhea was diagnosed with vertigo, probably secondary to acute labyrinthitis, chronic pain, malaise and fatigue. (R. at 268.) On July 3, 2007, Rhea was diagnosed with chronic fatigue and pain syndrome. (R. at 272.) On July 26, 2007, Rhea was diagnosed with chronic pain of the abdomen and back, etiology not clear, and chronic anxiety and depression. (R. at 273.)

On April 24, 2008, Rhea reported that he was somewhat more active and interested in getting a full-time job with the local school system. (R. at 280.) He was diagnosed with chronic low back pain, chronic abdominal pain, probably secondary to irritable bowel, and chronic depression. (R. at 280.) On December 10, 2008, Rhea reported that his fibromyalgia symptoms had improved with medication, and that overall he was doing better. (R. at 283.) On May 4, 2009, Rhea's back was nontender, straight leg raising tests were negative, and he had no local muscle tenderness. (R. at 284.) On September 10, 2009, Rhea reported that his medications were helping him psychologically and with his chronic pain. (R. at 288.) On April 14, 2010, and August 12, 2010, Rhea reported that he was regularly exercising, by way of walking, and was doing well overall. (R. at 294, 297.)

On April 13, 2011, Rhea reported that he recently fell twice. (R. at 308.) He was diagnosed with unprovoked falls, possibly secondary to dysrhythmia, and chronic pain. (R. at 308.) On May 17, 2011, Rhea reported having more pain and that he had again fallen twice. (R. at 303.) Dr. Green diagnosed falls, possibly secondary to arrhythmia. (R. at 303.) On June 5, 2011, an x-ray of Rhea's left wrist showed a fracture following a fall. (R. at 304-06.) On June 23, 2011, a bone mineral density study of Rhea's right hip and lumbar spine was normal, with exception of age-related degenerative changes in the lumbar spine. (R. at 310-11.) On July 12, 2011, Rhea reported doing well overall. (R. at 320.) A bone

densitometry showed osteopenia in the hip without osteoporosis or osteopenia in the spine. (R. at 320.) Rhea stated that his anxiety and panic attacks were controlled with medication. (R. at 320.) On October 21, 2011, Rhea was diagnosed with iron deficiency anemia. (R. at 324.) On December 19, 2011, Dr. Green reported that Rhea was cheerful and in no acute distress. (R. at 351.) Rhea continued to see Dr. Green through 2012 for acute prostatitis, chronic pain, chronic anxiety and recurrent falls. (R. at 350, 357-58, 362, 366, 374.) There is no indication that Dr. Green placed any limitations on Rhea's work-related abilities.

On June 19, 2012, Dr. Green reported that depression and anxiety affected Rhea's physical condition. (R. at 431-35.) He noted that pain constantly interfered with Rhea's ability to attend and concentrate. (R. at 432.) Dr. Green found that Rhea was incapable of even "low stress" jobs. (R. at 432.) He reported that Rhea could walk less than one city block without interruption or severe pain. (R. at 432.) Dr. Green reported that Rhea could sit and/or stand up to 15 minutes without interruption and that he could sit, stand and/or walk less than two hours in an eight-hour workday. (R. at 432-33.) He reported that Rhea would need to walk for up to 10 minutes every 15 minutes during an eight-hour workday. (R. at 433.) Dr. Green reported that Rhea would need the opportunity to shift positions at will from sitting, standing or walking. (R. at 433.) He found that Rhea should never lift and carry items in a competitive work situation. (R. at 433.) He opined that Rhea could frequently look down, turn his head to the right or left, look up and hold his head in static position. (R. at 434.) Dr. Green opined that Rhea should never twist, stoop, crouch and climb ladders, but that he could occasionally climb stairs. (R. at 434.) He opined that Rhea would be absent from work more than four days per month. (R. at 434.)

In a February 25, 2013, letter, Dr. Green stated that he had been Rhea's personal physician since 1984. (R. at 437.) He stated that Rhea suffered from chronic pain syndrome, secondary to degenerative disc disease in his back and fibromyalgia. (R. at 437.) Dr. Green also noted that Rhea experienced recurrent prostatitis, Vitamin D deficiency, frequent falls and poorly controlled insomnia. (R. at 437.) Dr. Green opined that Rhea was unable to work because of his chronic pain. (R. at 437.)

From March 22-26, 1999, Rhea was seen at the Mayo Clinic for complaints of abdominal pain and lower back and leg pain. (R. at 448-57.) Examination showed that Rhea had normal spine posture; excellent range of motion of the lumbar spine; no synovitis in his joints; full range of motion in his joints; normal deep tendon reflexes; normal coordination; and normal muscle strength in his lower extremities. (R. at 455.) Rhea had discomfort with patellar compression, particularly of the left knee. (R. at 455.) A small bowel follow-through examination was normal. (R. at 452.) A CT scan of Rhea's abdomen and pelvis showed cholelithiasis. (R. at 452.) X-rays of Rhea's lumbar spine were negative. (R. at 452.) An upper endoscopy showed a minimal degree of antral gastritis, and biopsies showed mild chronic gastritis, but no evidence of Helicobacter pylori. (R. at 452.) A colonoscopy was normal, as were biopsy test results. (R. at 452.) He was diagnosed with mild antral gastritis; probable gastroesophageal reflux disease, ("GERD"); irritable bowel syndrome; asymptomatic gallstones; elevated alkaline phosphatase; rheumatologic complaints; bilateral hip adductor tendonitis; patellofemoral pain; bilateral pes planus; obesity; and poor posture. (R. at 449, 451.) It was recommended that Rhea do low back exercises, stretching and aerobic conditioning. (R. at 455.) No restrictions were placed on Rhea's work-related abilities.

In November 2000, Rhea reported that he felt better and that the medications had relieved all gastrointestinal symptoms. (R. at 445.) Examination was normal, including Rhea's gait. (R. at 446.) Rhea was encouraged to lose weight. (R. at 446.) In December 2000, a bone densitometry was normal. (R. at 440.) Rhea reported that his GERD symptoms had dramatically improved. (R. at 440.) An endoscopy showed no evidence of erosive disease. (R. at 440.) Records dated August 2007, show that a CT scan of Rhea's chest revealed cholelithiasis and degenerative disc disease at the lumbosacral junction. (R. at 458.) An MRI of Rhea's brain showed mild microvascular ischemic disease of leukoaraiosis and mild generalized age-related cerebral volume loss. (R. at 458.) Rhea was treated conservatively and showed improvement with medication.

On November 30, 2011, Rhea was admitted to Wellmont Bristol Regional Medical Center, ("BRMC"), for syncope. (R. at 330-46.) On examination, Rhea was slow, with almost slurred speech, and he found it difficult to find words. (R. at 334.) An echocardiogram showed a mild concentric left ventricular hypertrophy with normal systolic and diastolic function; ejection fraction was 55 percent; the mitral valve was minimally thickened with normal function; a trace tricuspid insufficiency with estimated peak right valve systolic pressure mildly elevated; and epicardial fat pad was noted in the apex without definite effusion. (R. at 342-44.) Rhea was found to be anemic and dehydrated. (R. at 351.) Once he was rehydrated, he improved and was discharged. (R. at 351.)

On February 23, 2013, Teresa E. Jarrell, M.A., a licensed psychologist, evaluated Rhea at the request of Rhea's attorney. (R. at 405-18.) Rhea reported no past mental health treatment, except for his treating physician prescribing psychotropic medications. (R. at 406.) Jarrell reported Rhea's mood as mildly

-11-

anxious, and his affect appeared broad-ranged. (R. at 407.) Rhea reported that he had experienced symptoms of depression and anxiety since he was a young adult. (R. at 407.) He reported problems with panic attacks. (R. at 407.) Rhea's immediate and remote memory was within normal limits, and recent memory was mildly deficient. (R. at 408.) Concentration and judgment were found to be mildly deficient, and his insight was within normal limits. (R. at 408.) Jarrell reported that personality tests clearly substantiated problems with depression, anxiety and preoccupation with pain. (R. at 413.) Jarrell diagnosed recurrent, moderate, major depressive disorder; panic disorder with agoraphobia; generalized anxiety disorder; and pain disorder. (R. at 413.) She assessed his then-current Global Assessment of Functioning score, ("GAF"),[5] at 47.[6] (R. at 419.) She reported that Rhea's prognosis was poor and that he was permanently disabled. (R. at 414.)

Jarrell completed a mental assessment indicating that Rhea had a limited, but satisfactory, ability to remember work-like procedures; to understand and remember very short and simple instructions; to make simple work-related decisions; to ask simple questions or request assistance; and to interact appropriately with the general public. (R. at 419-23.) She found that Rhea had a seriously limited, but not precluded, ability to carry out very short and simple instructions; to work in coordination with or proximity to others without being unduly distracted; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without unduly distracting

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." *See* DSM-IV at 32.

them or exhibiting behavioral extremes; to be aware of normal hazards and take appropriate precautions; to set realistic goals or make plans independently of others; to maintain socially appropriate behavior; to travel in unfamiliar places; and to use public transportation. (R. at 421-22.) Jarrell also reported that Rhea was unable to maintain attention for two-hour segments; to maintain regular attendance and be punctual within customary, usually strict tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to respond appropriately to changes in a routine work setting; to deal with normal work stress; to understand, remember and carry out detailed instructions; and to deal with stress of semi-skilled and skilled work. (R. at 421-22.) She noted that Rhea's impairments would cause him to be absent from work more than four days per month. (R. at 423.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2014).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Williams argues that the ALJ's decision denying Rhea's claim for DIB benefits is not based on substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9.) In particular, Williams argues that the ALJ erred by failing to properly evaluate Rhea's subjective complaints of pain. (Plaintiff's Brief at 9-12.) Williams also argues that the ALJ erred by determining that Rhea had the residual functional capacity to perform past relevant work. (Plaintiff's Brief at 16-17.) In particular, Williams argues that Rhea did not have past relevant work because his work as a teacher and a coach was performed more than 15 years before the ALJ's decision. (Plaintiff's Brief at 16-17.) Williams further argues that this case should be remanded based on new and material evidence presented to the Appeals Council. (Plaintiff's Brief at 12-16.)

Williams argues that the ALJ erred by failing to properly consider the effect of Rhea's pain on his ability to perform substantial gainful activity. I disagree. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence

-14-

Case 1:13-cv-00071-PMS   Document 19   Filed 02/10/15   Page 14 of 19   Pageid#: 535

of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about his pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers. ...

76 F.3d at 595.

In her decision, the ALJ noted that Rhea responded to medication and that his treatment was essentially routine and/or conservative in nature. (R. at 21.) The ALJ further noted that Rhea never sought or received treatment from a specialist and treated exclusively with Dr. Green, who noted that Rhea, despite his impairments, enjoyed traveling, shopping and reading. (R. at 21, 211.) At no time during the relevant time period did Dr. Green report loss of strength, atrophy or other signs associated with physical impairments. The record shows that on numerous occasions, Rhea reported improvement and that he was doing well. (R. at 176, 209, 222, 225-26, 237-38, 283, 288, 294, 297.) Albeit was five months after

-15-

Case 1:13-cv-00071-PMS   Document 19   Filed 02/10/15   Page 15 of 19   Pageid#: 536

his insured status expired, in August 2001 Rhea stated that he could walk up to three miles without difficulty. (R. at 209.) Although Rhea saw a specialist in November and December 2000, these visits were for stomach discomfort, and no functional limitations were identified at that time. (R. at 440, 445-46.) To the extent that the ALJ found Rhea's complaints to be credible and supported by the record, she restricted Rhea to medium work. (R. at 18-21.) Based on this, I find that substantial evidence exists to support the ALJ properly considered the effect of Rhea's pain on his ability to perform substantial gainful activity.

Williams asserts that the Appeals Council erred in not addressing all of the additional evidence submitted after the ALJ's decision. (Plaintiff's Brief at 12-16.) The Fourth Circuit has explicitly held that the Appeals Council is not required to articulate any reason for denying a request for review. *See Meyer v. Astrue*, 662 F.3d 700, 704-07 (4th Cir. 2011); *Hollar v. Comm'r of Soc. Sec.*, 194 F.3d 1304, 1304 (4th Cir. 1999), *cert. denied.* 530 U.S. 1219 (2000) (rejecting the argument that the Appeals Council must "articulate its own assessment of the additional evidence"). Williams argues that the Appeals Council failed to consider the medical reports dated August 20, 2007, to August 27, 2007, from the Mayo Clinic. (Plaintiff's Brief at 12.) I do not agree. The Appeals Council noted that it considered additional evidence listed on the Order of Appeals Council, which included medical records from the Mayo Clinic dated March 22, 1999, to December 1, 2000. (R. at 6.) In addition, the Appeals Council stated in the Notice of Appeals Council Action that it reviewed the medical records from the Mayo Clinic dated August 20, 2007, to August 27, 2007. (R. at 2.) The Appeals Council noted that the ALJ decided Rhea's case through March 31, 2001, the date last insured, and found that the new evidence was for a later time; therefore, the Appeals Council found that it would not affect the ALJ's decision. (R. at 2.)

In particular, Williams argues that the ALJ found that Rhea had "never sought or received treatment from a specialist; all treatment has been rendered by his primary care provider," and that the records from the Mayo Clinic showed that he had, indeed, been treated by specialists. (R. at 13, 21.) Rhea was seen at the Mayo Clinic in March 1999 and November and December 2000 for complaints of abdominal pain and lower back and leg pain. (R. at 438-57.) In March 1999, examination showed that Rhea had normal spine posture; excellent range of motion of the lumbar spine; no synovitis in his joints; full range of motion in his joints; normal deep tendon reflexes; normal coordination; and normal muscle strength in his lower extremities. (R. at 455.) Rhea had discomfort with patellar compression, particularly of the left knee. (R. at 455.) It was recommended that Rhea do low back exercises, stretching and aerobic conditioning. (R. at 455.) No restrictions were placed on Rhea's work-related abilities.

Also in March 1999, a small bowel follow-through examination was normal. (R. at 452.) A CT scan of Rhea's abdomen and pelvis showed cholelithiasis. (R. at 452.) X-rays of Rhea's lumbar spine were negative. (R. at 452.) An upper endoscopy showed a minimal degree of antral gastritis, and biopsies showed mild chronic gastritis, but no evidence of Helicobacter pylori. (R. at 452.) A colonoscopy was normal, as were biopsy test results. (R. at 452.) In November 2000, Rhea reported that he felt better and that the medications had relieved all gastrointestinal symptoms. (R. at 445.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Examination was normal, including Rhea's gait. (R. at 446.) Rhea was encouraged to lose weight. (R. at 446.) In December 2000, a bone densitometry was normal. (R. at 440.) Rhea reported that his GERD symptoms had dramatically improved. (R. at 440.) An endoscopy showed no evidence of erosive

-17-

disease. (R. at 440.)

Williams further argues that the ALJ erred by determining that Rhea's previous work as a teacher and a coach constituted past relevant work as defined in the regulations because Rhea had performed those jobs more than 15 years before the ALJ's decision. (Plaintiff's Brief at 16-17.) I do not agree. If a claimant for DIB is determined to retain the ability to perform his past relevant work, he will not be found to be disabled. *See* 20 C.F.R. § 404.1520(e) (2014). The regulations provide that:

> We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity. We do not *usually* consider that work you did 15 years or more before the time we are deciding whether you are disabled (or when the disability insured status requirement was last met, if earlier) applies. A gradual change occurs in most jobs so that after 15 years it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply. The 15-year *guide* is intended to insure that remote work experience is not currently applied.

20 C.F.R. § 404.1565(a) (2014) (emphasis added); *see also Barnes v. Sullivan*, 932 F.2d 1356, 1358 n.2 (11th Cir. 1991).

Rhea stated that he worked as a teacher and a coach from 1984 to 1995. (R. at 142, 149.) The ALJ found that Rhea's date last insured was March 31, 2001. (R. at 17.) In DIB cases, the 15-year period, relevant at steps four and five, runs from the date that a claimant's insured status expired. Social Security Ruling 82-62 provides that the 15-year period is the 15-year period preceding the date the claimant's disability insured status was last met. S.S.R. 82-62, (WEST'S SOCIAL

SECURITY REPORTING SERVICE, Rulings (West 1983). Rhea had, indeed, worked within 15 years of his insured status expiring on March 31, 2001. Thus, I find that substantial evidence exists to support the ALJ's finding that Rhea's work as a teacher and a coach were considered "past relevant work."

It is for all of the above-stated reasons that I find that the ALJ's residual functional capacity finding and her finding that Rhea was not disabled is supported by substantial evidence. An appropriate order and judgment will be entered.

DATED: February 10, 2015.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE